UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ NOV 1 0 2010 ★

BROOKLYN OFFICE

CV 10 - 5205

LJG ASSET MANAGEMENT INC.,
on behalf of itself and all others similarly situated
similarly situated,

                Plaintiff,

    -against-

JPMORGAN CHASE & CO., J.P. MORGAN
CLEARING CORP., J.P. MORGAN SECURITIES
INC., J.P. MORGAN FUTURES INC., HSBC
HOLDINGS PLC, HSBC SECURITIES (USA) INC.,
HSBC BANK USA NATIONAL ASSOCIATION,
AND JOHN DOES 1-10,

             Defendants.

: **CLASS ACTION COMPLAINT**

: **JURY TRIAL DEMANDED**

: **MATSUMOTO, J.**

Plaintiff LJG Asset Management, Inc., individually and on behalf of all others similarly

situated, by its undersigned attorneys, brings this action against Defendants JP Morgan Chase &

Co., J.P. Morgan Clearing Corp., J.P. Morgan Securities Inc., J.P. Morgan Futures Inc. (the "JP

Morgan Defendants"), HSBC Holdings PLC, HSBC Securities (USA) Inc., HSBC Bank USA

National Association (the "HSBC Defendants"), and John Does 1-10 (collectively with the "JP

Morgan Defendants" and "HSBC Defendants", the "Defendants"), and based on information and

belief[1], alleges violations of Section 22(a)(1) of the Commodity Exchange Act ("CEA"), 7

U.S.C. § 25(a)(1), and Section 1 of the Sherman Act, 15 U.S.C. § 1 as follows:

---

[1] Plaintiff's information includes (a) reports of statements by Commodity Futures Trading Commission ("CFTC") Commissioner Bart Chilton that the silver market has been and is being manipulated; (b) public news reports about the investigation by the CFTC of manipulation in the silver market; (c) news reports of JP Morgan's recent decision to close its metals trading operation; (d) reports showing the recent reduction in the concentration of open interest in the silver futures contracts held by commercial firms; (e) reports of silver and gold prices and silver futures and silver options prices; (f) reports of trading activity, open interest and other aspects of silver futures, and silver options trading; (g) webcasts and statements of the March 25, 2010 Meeting of the CFTC to Examine Futures and Options Trading in the Metals Markets; and (h) other public reports of the information alleged herein.

## NATURE OF CLAIM

1.   This action arises from Defendants' conspiracy to intentionally and unlawfully suppress and manipulate the price of Commodity Exchange, Inc. ("COMEX") silver futures and options contracts between at least March 1, 2008 through the present (the "Class Period"), in violation of Section 22(a)(1) of the CEA, 7 U.S.C. § 25(a)(1), and Section 1 of the Sherman Act, 15 U.S.C. § 1.

2.   During the Class Period, the Defendants engaged in a scheme to manipulate and suppress the market for COMEX silver futures and options contracts after the JP Morgan Defendants' acquisition of Bear Stearns & Co., Inc. ("Bear Stearns"). At the time of the acquisition, Bear Stearns held a massive short position in the silver futures market. The JP Morgan Defendants, in combination with the HSBC Defendants used their short positions to dramatically and artificially reduce the price of silver futures and options contracts. By their unlawful manipulation, Defendants reaped at least hundreds of millions of dollars of illicit profits.

3.   As explained in more detail herein, the massive short position acquired by the JP Morgan Defendants were essentially a bet that the value of silver futures and options contracts would decrease. However, Defendants' manipulation of silver futures and options prices stacked the deck in their favor, virtually guaranteeing that they would not lose the bet. As a result, any person or institution on the other side of the bet was wrongfully harmed.

4.   The details of the scheme have been brought to light by a whistleblower ("Whistleblower"), formerly of Goldman Sachs, who was told first-hand by traders working for the Defendants that the Defendants manipulate the precious metals markets. The Whistleblower reported Defendants wrongful conduct to the Commodity Futures Trading Commission ("CFTC") in November 2009.

5.  In communications with the CFTC, the Whistleblower specified the means by which the JP Morgan Defendants signaled market participants in advance of the intended manipulation, so that the Defendants together could artificially suppress and manipulate the price of COMEX silver futures and options contracts and reap at least hundreds of millions of dollars in ill-gotten gains.

6.  In one example, on February 3, 2010, the Whistleblower gave two days advance warning by email to Eliud Ramirez, a senior Investigator at the CFTC's Enforcement Division, that the price of silver would be dramatically depressed two days later. Indeed, between February 3, 2010 and February 5, 2010, the price of silver dropped dramatically.

7.  Based on the Whistleblowers representations, the CFTC opened an investigation into the manipulation of the silver market. As a result, on October 26, 2010, CFTC Commissioner Bart Chilton announced that the CFTC had discovered "violations of the Commodity Exchange Act in the silver market", that the violations stemmed from "fraudulent efforts to persuade and deviously control" prices in the silver market, and that the wrongful acts "should be prosecuted."

8.  Federal law enforcement officials are conducting a criminal investigation into the price manipulation by Defendants of the silver market, including whether the Defendants' COMEX trades in silver futures and options contracts, as well as trades on the London Bullion Market Association's Exchange (the physical delivery market for silver), violated the law.

## JURISDICTION AND VENUE

9.  This Court has jurisdiction under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15(a) and 26, Section 22 of the CEA, 7 U.S.C. §25, and U.S.C. §§ 1331 and 1337.

10. Venue is property in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, 7 U.S.C. § 25(d) and 28 U.S.C. § 1391 (b)-(d). Defendants resided, transacted business, were found, or had agents in this District and or/the claims arose in this District.

## PARTIES

11. Plaintiff is a corporation organized and existing under the laws of the State of New York. During the Class Period Plaintiff traded COMEX silver futures and options contracts, and was injured as a result of Defendants' anticompetitive acts and market manipulation.

12. Defendant J.P. Morgan Chase & Co. is a Delaware financial holding company with its principal place of business in New York, New York. JP Morgan Chase & Co. is a leading global financial services firm and one of the largest banking institutions in the United States.

13. Defendant J.P. Morgan Clearing Corp., ("JPMC"), formerly known as Bear Stearns Securities Corp., is a Delaware corporation with its corporate offices in Brooklyn, New York. JPMC is a subsidiary of JPMorgan Securities Inc., which is a wholly owned subsidiary of JPMorgan Chase & Co. JPMC is a registered Futures Commission Merchant with the CFTC.

14. Defendant J.P. Morgan Securities ("JPMS") is a Delaware corporation with its principal place of business in New York, New York. JPMS is a wholly owned subsidiary of JPMorgan Chase & Co. JPMS, through JPMC, provides securities and futures clearing, customer financing, securities lending and related services.

15. Defendant J.P. Morgan Futures ("JPMFI") is a Delaware corporation with its principal place of business in New York, New York. JPMFI is a U.S. Futures Commission Merchant and wholly owned subsidiary of JPMorgan Chase & Co. JPMFI provides research, sales, execution and clearing services in futures and options across fixed income, equity, foreign exchange and

4

commodity asset classes. JPMFI holds the U.S. accounts of JPMorgan Chase's global futures and options business customers.

16. Defendant HSBC Holdings plc ("HSBC Holdings") is a United Kingdom public limited company with its corporate headquarters in London, England. As of 2009, HSBC Holdings was the world's largest banking group and the world's sixth largest company according to Forbes Magazine.

17. Defendant HSBC Securities (USA) Inc. ("HSBC USA") is a Delaware corporation with a corporate office located in New York, New York. HSBC USA is a wholly owned subsidiary of HSBC Markets (USA) Inc. whose ultimate parent is HSBC Holdings plc. HSBC USA is a registered broker-dealer of securities under the Securities Exchange Act of 1934 and is a registered Futures Commission Merchant with the CFTC.

18. Defendant HSBC Bank USA, National Association ("HSBC NA") is a Texas company with an office in Wilmington, Delaware.

19. John Doe Defendants 1-10 are persons whose identities are presently unknown to Plaintiff, who performed, participated in, furthered , and/or combined, conspired or agreed with others to perform the unlawful acts alleged herein, including the restraint of trade, fixing of prices, and manipulation of silver futures and silver options traded on the COMEX.

## THE RELEVANT MARKET

20. The relevant market, which was the target of Defendants' anticompetitive and unlawful scheme, is COMEX silver futures and options contracts.

## CLASS ACTION ALLEGATIONS

21. Plaintiff brings this action as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of himself and other similarly situated. The "Class" is defined as:

> All persons or entities other than Defendants and their employees, affiliates, parents, subsidiaries or co-conspirators (whether or not named in this Complaint) who transacted in COMEX silver futures or options contracts between March 1, 2008 through such time as the effects of Defendants' illegal conduct ceased.

22. The Class is so numerous that joinder of all members is impracticable. While the exact number of the Class members is unknown to Plaintiff at this time, Plaintiff is informed and believes that at least thousands of geographically dispersed Class members traded COMEX silver futures and options contracts during the Class Period.

23. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged herein.

24. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action litigation, including commodity manipulation and antitrust class action litigation.

25. Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    a.    Whether Defendants conspired with others to artificially depress and manipulate the price of COMEX silver futures and options contracts in violation of the Sherman Act;

b.     Whether Defendants' conduct, which manipulated and suppressed the prices of COMEX silver futures and options contracts, violates CEA;

c.     Whether Defendants' conduct had an anticompetitive and manipulative effect on the prices of COMEX silver returns and options contracts purchased or sold by Plaintiff and the Class during the Class Period; and

d.     The appropriate measure of damages, under the CEA and federal antitrust laws, sustained by Plaintiff and other members of the Class as a result of Defendants' unlawful activities.

26. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

27. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## FACTUAL ALLEGATIONS

I.     **Background**

A.     **Overview of COMEX Silver Futures and Options Contracts**

7

28. Silver futures contracts and silver options contracts are traded on COMEX.

29. COMEX is a division of the New York Mercantile Exchange ("NYMEX") and has been designated by the CFTC as a contract market under Section 5 of the CEA, 7 U.S.C. § 7. COMEX is an organized, centralized market that provides a forum for trading silver futures and options contracts. It designs, creates the terms of, and conducts trading in various precious metals futures and options contracts, including futures for and options contracts for silver.

30. COMEX submits rules and regulations governing these activities to CFTC for approval.

31. COMEX provides standardized silver futures contracts with delivery dates commencing with the next calendar month and potentially extending as far as 60 sequential months into the future depending upon the month in which the contract was executed. A silver futures contract is an agreement to buy or sell a fixed amount of silver at a date in the future. The COMEX specifies the terms of trading, including the trading units, price quotation, trading hours, months, minimum and maximum price fluctuations and margin requirements.

32. On the COMEX, contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

33. On the COMEX, the expiration date of an options contract, or "Options Expiry," is the day on which an options contract is no longer valid and therefore, ceases to exist.

34. Trades of silver futures contracts on COMEX have two "sides." The "long" side represents the buyer of a contract who is obligated to receive payment for the silver and make delivery. If a market participant holds its position to the end of the settlement period for a silver futures contract, the market participant is obligated to "go to delivery." To "go to delivery" means that upon the settlement date, the "futures" contract for a particular month becomes a

8

present contractual obligation for the purchase and sale of the physical silver. Longs must take delivery and shorts must make delivery of 5,000 troy ounces per contract over the course of the contract month. The price for the silver that goes to delivery is the "settlement price" of the COMEX silver futures contract.

35. Only a small percentage of all futures contracts traded each year on COMEX and other exchanges results in actual delivery of the underlying commodities. Instead, traders generally offset their futures position before their contracts mature. For example, a purchaser of a silver futures contract can cancel or offset his future obligation to the contract market/exchange clearing house to take delivery of silver by selling an offsetting futures contract. The difference between the initial purchase or sale price and the price of the offsetting transaction represents the realized profit or loss.

**B.     Short Option Positions**

36. To "go short" in any commodity, including silver, is to bet that the price of silver will decrease. There are several ways to take short positions, or "go short". As discussed *supra*, one can sell a futures contract which confers upon the seller an obligation to deliver silver at a pre-specified date in the future at a pre-specified price. Another way to "go short" is to sell call options, which confers upon the buyer of the call option the right, but not the obligation to purchase silver from the seller at a pre-specified "strike price" at some date in the future (*i.e.*, expiry). At expiry, if the price of silver exceeds the strike price, the buyer will exercise the option, which means the seller will pay the difference between the prevailing price and the strike price. Conversely, if the price of silver falls short of the strike price, the option expires "out of the money."

37. In the cases above (or any other method in which an entity creates a short position), the entity that is short benefits as prices fall. In the case of selling futures contract, the seller at the time of contract expiration simply offsets his position by purchasing a futures contract and pockets the difference in prices. In the case of a call option, the seller benefits if the prevailing purchase price is below the strike price because it collects the option premium and pays nothing to the purchaser.

38. Upon information and belief, during the Class Period, Defendants had net short positions in silver options contracts, including but not limited to, the sale of call options.

### C.   Physical and Futures Prices for the Underlying Physical Commodity Are Directly Related To One Another

39.   The futures prices are the market's consensus of the expected spot price for the underlying physical commodity at a specified future date.  Because the futures price is nothing more than an expectation of the future spot price, both futures and physical prices must be and are, in fact, correlated.  For example, if the futures price in a contract negotiated today for delivery next month starts to rise, this indicates that the market believes spot prices will rise next month.  The rise in the future price for next month delivery will cause a reaction today among producers and consumers of commodity.

40.   For the producers of the commodity, the increase in the price of that commodity for delivery next month makes it more profitable to shift sales from the current month to the next month.  Conversely, for buyers of physical silver, the increase in price for delivery next month creates an incentive for them to purchase today rather than waiting until next month when the price increase is expected.  Thus, the increase today in futures price (for delivery next month) has caused producers to decrease the available supply of the commodity and prompted buyers of physical silver to increase their demand.  The decrease in supply coupled with the increase in

10

demand, causes today's spot prices for the commodity to increase.  The same causal economic story (albeit in reverse) prevails if futures prices decline.

41.   Therefore, changes in futures prices for delivery methods in the future have tangible effects on physical spot prices today.  Put statistically, futures prices and physical spot prices are aligned and correlated.

## II.   Through Their Enormously Concentrated Short Positions, Defendants Had the Power to and Did Suppress COMEX Silver Futures and Options Contract Prices

### A.   The COMEX Silver Futures and Options Contracts Market is Susceptible to Collusion

42.   The silver futures market is a thin market.  The number of futures contracts traded in the silver market is small, *i.e.*, thin, in comparison to markets involving other commodities.  For instance, in August 2008, there were only 129,240 open interest silver futures contracts, *i.e.*, silver futures contracts that had not yet settled, as opposed to 1.25 million open interest NYMEX Light Sweet Crude Oil futures contracts and 408,430 open interest COMEX gold futures contracts during the same period.

43.   The relatively sparse number of silver futures contracts regularly traded on COMEX enabled large banks, such as Defendants, to manipulate the price of silver futures contracts during the Class Period by flooding the market with a disproportionate number of contracts.

44.   In addition, the market for COMEX silver futures and options contracts is highly concentrated with only a handful of very large banks controlling a dominant number of futures and options contracts.

45.   In August 2008, subsequent to JPMorgan's acquisition of Bear Stearns, Defendants JPMorgan and HSBC controlled over 85% of the commercial net short position in COMEX silver futures contracts and 25% of all open interest short positions.

46.    In the first quarter 2009, HSBC NA held 40% of all precious metals derivatives (excluding gold) held by commercial banks.

47.    As of the first quarter 2009, Defendants owned more than 96 percent of all precious metal derivatives held by U.S. banks (excluding gold) with a combined notional value of $7.9 billion.[2]

48.    As one prominent silver trader publicly commented:

> In studying the micro-price movement personality of the COMEX silver market, I can tell you that it behaves like no other market. The typical available liquidity in the deck is tiny, yet we have average daily volume in excess of 40,000 contracts. And as a result, there is significant price volatility for the market to absorb large orders. The existence of oversized market participants has a chilling effect on the market makers, which results in even less liquidity as market makers widen their prices to compensate for the increased risks they are taking. Consequently, the large orders wind up setting prices, rather than the proper function of the futures markets to discover prices.

**B.**    **The Collapse of Bear Stearns Sets the Stage for Defendants' Collusion**

49.    In March 2008, JPMorgan purchased Bear Stearns which, upon information and belief, had amassed a significant short position in COMEX silver futures and options contracts.

50.    Once JPMorgan acquired Bear Stearns' commodities portfolio, which upon information and belief, included a substantial net short position in silver futures and options contracts, JPMorgan was faced with one of two choices: (i) it could cover the outstanding short positions it inherited by purchasing offsetting long positions, thus causing the price of silver to rise and exposing it to substantial losses; or (ii) it could purchase additional short contracts in the hope that the price of silver decreased. Given JPMorgan's significant market power in an already thin, concentrated market, JPMorgan knew that it could undertake massive short positions with

---

[2]    The "notional value" is the value of a derivative's underlying asset as determined by the asset's spot price. In the case of an options or futures contract, the notional value is the number of units of the asset underlying the contract multiplied by the spot price of the asset.

relatively little or no risk.  This was particularly true since it knew that HSBC, and others, would follow its lead.

51.   By August 5, 2008, Defendants were short a massive 33,805 contracts, or more than 169 million troy ounces of silver.  Incredibly, Defendants took no corresponding long positions.  This short position was equal to an astounding 25% of annual world mine production of silver.

52.   Defendants have consistently maintained their massive short position at critical times throughout the Class Period, controlling significantly more than 25% of open interest in such positions.  This stands in stark contrast to foreign banks whose short positions in COMEX silver futures contracts have been consistently less than 5% of open interest in these positions.

53.   Defendants' concentrated short position in silver futures contracts far exceeds that of the notorious Hunt Brothers who settled charges with the CFTC stemming from their manipulation of the silver market.[3]

54.   A review of the Office of the Comptroller of the Currency's Quarterly Report on Bank Derivatives Activities for the first quarter of 2009, which provides information on the value of derivative contracts for the top five commercial banks and trust companies, reveal that, together, JPMorgan and HSBC controlled 96% of all precious metals derivative contracts (including silver) besides gold.

55.   Upon information and belief, Defendants have maintained a market share in excess of 90% of all precious metals derivative contracts excluding gold throughout the Class Period.

### III.   The CFTC's Investigation of Defendants' Conspiracy to Manipulate the Price of COMEX Silver Futures Contracts and Options

---

[3]      In the 1970s, Nelson Bunker Hunt and William Herbert Hunt, two heirs on an oil fortune, attempted to corner the silver market, eventually accumulating long positions in almost 10 percent of the known world supply of silver.  In 1985, the Hunt Brothers were charged by the CFTC with manipulating and attempting to manipulate the prices of silver futures contracts and silver bullion during 1979 and 1980.  The brothers eventually settled with the CFTC and filed for bankruptcy.

56.   In September 2008, the Commodity Futures Trading Commission ("CFTC") commenced an investigation into manipulation in the silver market after receiving "numerous letters, e-mails and phone calls" alleging that silver futures prices were being manipulated downward.

57.   In November 2009, the Whistleblower contacted the CFTC Enforcement Division and reported Defendants' illegal conspiracy to manipulate and suppress the prices of COMEX silver futures and options contracts.

58.   In his communications with the CFTC, the Whistleblower described how JPMorgan silver traders signaled market participants in advance of their manipulation, so that they, along with other traders, could reap enormous profits by artificially and unlawfully suppressing and manipulating the price of COMEX silver futures and options contracts.

59.   In subsequent communications, the Whistleblower informed the CFTC that he had observed JPMorgan signal the market that it intended, with others, to reduce and suppress the price of COMEX silver futures contracts, including at or around the date of options expiry.

60.   According to the Whistleblower, JPMorgan sent "signals" to HSBC and other co-conspirators prompting them to join JPMorgan's artificial suppression and manipulation of the price of COMEX silver futures and options contracts by flooding the market with short positions.

61.   These "signals" were sent on a monthly basis on or around the dates of certain key events, including: (a) following the United States Department of Labor's issuance of Non-Farm Payroll Reports[4], which are released during the first week of each month; (b) at the time of Options Expiry[5] on the last four business days of each month; and (c) during COMEX silver futures contracts roll-over.[6]

---

[4]      The Non-Farm Payroll Report is an influential statistic and economic indicator released monthly by the United States Department of Labor as part of a comprehensive report on the state of the labor market.

[5]      The expiration date of an options contract, a.k.a., Options Expiry, is the day on which an options contract is no longer valid and, therefore, ceases to exist. Because Defendants held net short positions in silver options contracts, Defendants profited by driving down the price of COMEX silver futures contracts. Indeed, by depressing the price of COMEX silver futures contracts, Defendants assured themselves that the long options contracts opposite their positions would expire out of the money. Since the options expired worthless, traders who owned the positions opposite to Defendants did not exercise their options and Defendants reaped a profit.

[6]      Contract rollover occurs each month when a futures contract holder exchanges (rolls over) an expiring contract position for a contract position which expires at a later date.

62.   The Whistleblower described signals that Defendants employed on a daily basis which the Whistleblower characterized as the "daily fix." During certain times of the day (typically when trading volume on the COMEX is light), Defendants rapidly dumped large numbers of COMEX silver futures contracts at or around the same suppressed price. It was understood among Defendants and their co-conspirators that the price of these contracts would set the direction of silver futures contracts prices for that day. As the Whistleblower explained in an email to Eluid Ramirez, Senior Investigator for the CFTC's Enforcement Division, dated January 26, 2010:

> As an example, if you look at the trades just before the pit open today you will see around 1,500 contracts sell at once where the bids were tiny by comparison for the fives and tens. This has the immediate effect of gaining $2,500 per contract on the short positions against long holders, who lose that in moments and were likely stopped out.

63.   The Whistleblower's statements concerning the "daily fix" are corroborated by Jeffrey Christian, Managing Director and founder of CPM Group, a commodities research and consulting company in New York. Christian recently testified before the CFTC that "there are times when companies enter the market with large trades during the New York pre-market, *apparently with the intention of moving prices in their favor by placing large orders or orders before the liquidity is there to accommodate such trades."* (emphasis added).

64.   In a subsequent email to Ramirez, dated February 3, 2010, the Whistleblower informed the CFTC that he had received a signal from Defendants indicating their intent to depress the prices of COMEX silver futures and options contracts two days later, at or around the time of the announcement of the Non-Farm Payroll Report. The Whistleblower then predicted how the manipulation would play out in an email:

Scenario 1.  The news is bad (employment is worse). This will have a bullish effect on gold and silver as the U.S. dollar weakens and the precious metals draw bids, spiking them higher.  This will be sold into within a very short time (1-5) mins with thousands of new short contracts being added, overcoming any new bids and spiking the precious metals down hard, targeting key support levels.

Scenario 2. The news is good (employment is better than expected).  This will result in a massive short position being instigated almost immediately with no move up.  This will not initially be liquidation of long positions but will result in stops being triggered, again targeting key support levels.

Both scenarios will spell an attempt by the two main short holders [JPMorgan and HSBC] to illegally drive the market down and reap very large profits.  Locals such as myself will be "invited" on board which will further add downward pressure.

65.   On February 5, 2010, the Whistleblower emailed Ramirez "to confirm that the silver manipulation was a great success and played out EXACTLY to plan and predicted . . ."  Indeed, as the chart below illustrates, the price of silver fell dramatically on February 3, 2010 following Defendants' manipulation just as the Whistleblower had predicted.



66.   The Whistleblower added, "[h]ow would this be possible if the silver market was not in the full control of [JPMorgan and HSBC] . . . I hope you took note of how and who added the

short sales (I certainly have a copy) and I am certain you will find it is the same concentrated shorts [JPMorgan and HSBC] who have been in full control since [JPMorgan] took over the Bear Stearns position."

67.   In March 2010, the Whistleblower went public with his allegations and revealed his emails to the CFTC predicting certain market movements.

68.   Upon information and belief, Defendants began to unwind their massive short positions shortly thereafter.  As reflected in the CFTC Bank Participation reports, the net short position of silver futures held by commercial banks, of which Defendants comprise the vast majority, have been reduced by more than 30% since March 2010.

69.   As Defendants' short position in COMEX Silver Futures contracts have decreased, the price of silver has risen dramatically.  Silver has gained 40 percent this year, touching $27.73 an ounce on November 9 2010, its highest level in 30 years.

70.   According to an October 27, 2010 article published in THE WALL STREET JOURNAL, the CFTC's enforcement staff has circulated a packet of information to CFTC lawyers and commissioners, outlining some of its findings in the silver probe, including documents that could suggest there have been attempts to manipulate prices.

71.   According to the same article, CFTC lawyers have interviewed employees of JPMorgan in its metals-trading business as well as industry traders, commodity executives, experts and employees of other metals-trading firms.

72.   The article also cites a CFTC weekly report for October 19, the most recent period, showing that less than four market players hold 24% of all net bearish bets in the silver market. Importantly, relying on silver traders and a person close to the investigation, the article confirms that Defendants JPMorgan and HSBC are among those market participants.

73.   On October 26, 2010, CFTC Commissioner Bart Chilton announced that there had been "violations of the Commodity Exchange Act in the silver market." Specifically, Commissioner Chilton concluded, "[t]here have been fraudulent efforts to persuade and deviously control" prices in the silver market, which "should be prosecuted." Commissioner Chilton indicated that the CFTC investigation was continuing and added that he was "hopeful that the agency will speak publicly about the investigation in the very near future."

## IV.   Changes Following the Government Investigation

74.   Prior to the government investigation of manipulation of COMEX silver futures prices that began in March 2010, silver prices greatly underperformed gold prices. Since the government investigation began, silver prices have greatly outperformed gold prices.

75.   This "price signature" is consistent with what would be expected of JPMorgan and HSBC when their unlawful activities are threatened by government investigations and possible exposure.

76.   After public complaints and government review of those complaints about manipulation of the silver markets in March 2010, among other things, Defendants (a) reduced the amount of their manipulative activities; (b) reduced the concentration of their holdings compared to the overall interest in the silver futures market; and (c) JPMorgan announced it was ending its metals trading operation.

77.   As Defendants cut back on unlawful activities, prices of silver futures traded on COMEX dramatically increased. Such prices have increased by approximately 50% since March 2010 even though no fundamental changes in supply or demand for silver, including industrial demand, have occurred during this time period. Gold prices increased by only 20% during this time period.

78.   Between March 2008 and March 2010, the price of gold has increased by approximately 20%.  Once the artificial depression of silver prices was removed, the price of silver increased by an astonishing 50% between March 2010 and the present, during the same period, the price of COMEX silver futures decreased by approximately 25%.

79.   This "price signature" is not explainable by any changes in supply and demand.  These price changes directly result, at least in one substantial part, from Defendants' reduction in their concentration and other reductions of their other unlawful activities in the silver markets since the government investigation of the public complaints about manipulation began in March 2010.

**V.   Defendants' Means of Manipulation**

80.   Defendants have affected the manipulation of price of COMEX silver futures and options contracts through means of both lawful and unlawful acts.

81.   Defendants have held large positions in silver futures and silver options.

82.   Defendants have held a concentrated and substantial amount of the open interest in silver futures contracts.

83.   Defendants have made large trades at key times.

84.   Defendants have placed large orders.

85.   Defendants or others have placed large "spoof" orders which appeared on the trading screens by the submission of a large order which was not executed, but which influenced prices, and was then withdrawn before it reasonably could be executed.

86.   Defendants have communicated with and/or signaled one another their trades by participating in "signals," meetings and other conversations to unlawfully discuss the price of COMEX silver futures and options contracts.

87.   Defendants have agreed through these "signals," meetings and other conversations to unlawfully drive down the price of COMEX silver futures contracts, prevent such prices from increasing, or to otherwise collusively make artificial the prices of COMEX silver futures and options.

## VI.   Other Market Facts Indicating a Conspiracy

88.   Various factors make the market for COMEX silver futures and options contracts susceptible to a price fixing and market manipulation conspiracy.

### Standardized Product with High Degree of Interchangeability

89.   When products offered are viewed as interchangeable by market participants, it is easier to unlawfully agree on the price for the product in question, and it is easier to effectively monitor agreed-upon prices.  This makes it easier to form and sustain an unlawful anticompetitive agreement or conspiracy.

90.   Here, COMEX silver futures and options contracts are interchangeable.  Indeed, COMEX specifies the terms of each contract, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

### Defendants Had a Motive to Manipulate the Price of COMEX Silver Futures and Options Contracts

91.   Defendants specifically intended to manipulate the price of COMEX silver futures and options contracts during the Class Period.  Defendants consistently took positions in their trading of COMEX silver futures and options contracts that would inure to their financial benefit. Defendants consistently profited from the artificially lower or suppressed COMEX silver futures prices because, throughout the Class Period, they maintained significant short positions in COMEX silver futures and options contracts.

92.   A significant portion of Defendants' short positions in the COMEX silver futures contracts were acquired through naked short selling, that is, Defendants would contract to sell in the future, silver which they did not own or had made no provisions to borrow.  Such naked short selling, unconstrained by the actual amount of silver owned or available to the short seller, enabled Defendants to more effectively suppress and manipulate COMEX silver futures and options contracts during the Class Period.

93.   It has been estimated by at least one commentator that Defendants' short positions are in excess of existing world inventories.  As one prominent trader publicly testified:

> The size of the open interest in COMEX silver is irresponsibly large, given the reality of world inventories and production. Additionally, there is a significant imbalance between the largest long positions and the largest short positions, with the shorts being heavily concentrated.  In a physically delivered futures contract for a commodity of finite-supply, this also exposes the marketplace to an unnecessary risk of failure-to-deliver.  Such an event could destroy the COMEX silver market.

94.   Because Defendants maintained significant naked short positions in COMEX silver futures and options contracts, they were incentivized to keep prices depressed and roll-over their massive short positions in succeeding months.  If prices for silver increased, Defendants would be forced to cover their short positions and suffer enormous losses or deliver physical silver in quantities well in excess of what was available in the market.

### Defendants Had the Opportunity to Conspire Through Their Participation in Trade Associations

95.   Participation in trade associations can foster and facilitate an unlawful anticompetitive conspiracy.  Throughout the Class Period, Defendants participated in numerous trade association activities and events together, which provided many opportunities to conspire and share confidential information and trading strategy.

21

96.   For example, Defendants are members of the Futures Industry Association ("FIA"), the Futures and Options Association ("FOA") and the London Bullion Market Association ("LBMA").

97.   HSBC USA and JPMFI are regular members of the FIA, a United States-based industry advocacy and education organization whose regular members are all futures commission merchants.  In addition, the FIA's board of directors includes the managing director and global co-head JPFMI's futures and options and OTC clearing, and Robert T. Cox, the managing director and head of futures HSBC USA.  Richard Berliand, the chairman of JP Morgan Futures and Options and head of JPMorgan-Bear Stearns' prime brokerage business, serves as a special advisor to the board.  As part of the FIA, Defendants participate in the annual Futures & Options Expo, the FIA/OIC Investor Education Day, the International Derivatives Expo, and other events and meetings.

98.   HSBC Bank PLC and JPMS are members of the FOA, an industry association for firms and institutions carrying on business in futures, options and other derivatives or which use such products in their business.  FOA's principal role is to represent the interests of its members in the public and regulatory domain and deliver a wide range of support services to the membership. Defendants participate in annual events and conferences such as International Derivatives Week. In addition, Richard Berliand of JPMFI serves as a special advisor to FOA's Board.

99.   Both JPMorgan Chase and HSBC NA are also members of the LBMA, the London-based trade association that represents the wholesale gold and silver bullion market in London.

### Absent an Unlawful Conspiracy to Suppress and Manipulate
### the Prices of COMEX Silver  Futures and Options Contracts,
### <u>Defendants' Actions Were Contrary to Their Economic Self-Interest</u>

100.  Each of the Defendants would have taken enormous short positions only if it knew beforehand and were confident that the other Defendant would support it and take similar short positions in the market for COMEX silver futures and options contracts.  Absent their collusion, signaling and prior knowledge, it would not be in each of the Defendant's independent economic self-interest to go out on a limb and take such enormous and concomitantly risky short positions.

### <u>FRAUDULENT CONCEALMENT</u>

101.  By its very nature, the unlawful activity, as alleged herein, that Defendants engaged in was self-concealing.  Defendants, *inter alia*, conspired and engaged in secret and surreptitious activities in order to manipulate and make artificial prices for COMEX silver futures and options contracts.

102.  Defendants fraudulently concealed their participation in their conspiracy to manipulate and make artificial the market for COMEX silver futures and options contracts by, among other things, engaging in secret meetings and communications in furtherance of the conspiracies. Because of such fraudulent concealment, and the fact that a conspiracy in restraint of trade is inherently self-concealing, Plaintiff and the members of the Class could not have discovered the existence of Defendants' conspiracy and manipulation any earlier than public disclosures thereof.

103.  Defendants agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy and manipulation.

contracts and otherwise to depress or make artificial the prices of COMEX silver futures and options;

c.   Defendants signaled to one another their intention to depress or otherwise make artificial the prices of COMEX silver futures and options contracts and colluded with one another in achieving this unlawful anticompetitive purpose; and

d.   Pursuant to such an unlawful conspiracy in restraint of trade, Defendants knowingly and collusively traded in order to depress or otherwise make artificial the price of COMEX silver futures and options contracts.

## ALLEGATIONS OF ANTITRUST
## INJURY TO PLAINTIFF AND THE CLASS

114.  Defendants' anticompetitive conduct had severe adverse consequences on competition in that Plaintiff and other members of the Class who traded COMEX silver futures and options contracts during the Class Period were trading at artificially determined prices that were suppressed as a result of Defendants' unlawful conduct.  As a consequence thereof, Plaintiff and the Class suffered financial losses and were, therefore injured in their business or property.

## COUNT ONE

## VIOLATION OF COMMODITY EXCHANGE ACT, 7 U.S.C. §1

115.  Plaintiff incorporates by reference the preceding allegations.

116.  Plaintiff and members of the Class sold COMEX silver futures contracts and/or purchased or sold options contracts during the Class Period at prices which were made artificial by Defendants' unlawful activities, and were injured as a result of Defendants' manipulation and suppression of the prices of those contracts.

117.  Defendants' activities constitute manipulation of the prices of COMEX silver futures and options contracts during the Class Period in violation of Sections 9(a) and 22(s) of the CEA, 7 U.S.C. §§ 13(a), 25(a).

118.  Defendants are liable to Plaintiff and members of the Class for the damages they sustained as a result of their CEA violations.

**COUNT TWO**

**AIDING AND ABETTING VIOLATIONS OF
COMMODITY EXCHANGE ACT, 7 U.S.C. §25**

119.  Plaintiff incorporates by reference the preceding allegations.

120.  Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein.  Defendants did so knowing of each other's manipulation and suppression of COMEX silver futures and options contract prices, and willfully intended to assist these manipulations to unlawfully cause the price of COMEX silver futures and options contracts to be suppressed or to otherwise reach artificial levels during the Class Period, in violation of Section 22(a)(1) of the CEA, 7 U.S.C. §25(a)(1).

121.  Defendants are liable to Plaintiff and the Class for the damages they sustained as a result of the CEA violations.

**COUNT THREE**

**VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT**

122.  Plaintiff incorporates by reference the preceding allegations.

123.  Defendants and their unnamed co-conspirators entered into and engaged in a conspiracy in unreasonable restraint of trade violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

27

124. During the Class Period, Defendants possessed market power in the market for the sale of COMEX silver futures and options contracts.

125. The conspiracy consisted of a continuing agreement, understanding or concerted action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed, maintained, suppressed and/or made artificial prices for COMEX silver futures and options contracts. Defendants' conspiracy is a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

126. Defendants' conspiracy, and resulting impact on the market for COMEX silver futures and options contracts, occurred in or affected interstate and international commerce.

127. As a proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have suffered injury to their business or property.

128. Plaintiff and members of the Class are each entitled to treble damages for the violations of the Sherman Act alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment on his behalf and on behalf of the Class herein, adjudging, ordering and decreeing:

A.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(3) of the Federal Rules of Civil Procedure, that Plaintiff be appointed as class representative, and the Plaintiff's counsel be appointed as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to be a violation of the CEA;

C.    That the Plaintiff and the Class recover damages, as provided under the CEA, together with prejudgment interests;

D.      That the unlawful conduct alleged herein is adjudged and decreed to be an unlawful restraint of trade in violation of Section 1 of the Sherman Act;

E.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint;

F.      That Plaintiff and the Class recover damages, as provided under federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against Defendants in an amount to be trebled in accordance with such laws;

G.      That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

H.      That the Court direct such further relief it may deem just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:          November 10, 2010

Respectfully submitted,

Scott W. Fisher

**GARWIN GERSTEIN & FISHER LLP**
Bruce E. Gerstein (BG-2726)
Scott W. Fisher (SF-8756)
Dan Litvin (DL-6312)
1501 Broadway
Suite 1416
New York, NY 10036

29

Telephone:  (212) 398-0055
Fax:  (212) 764-6620
bgerstein@garwingerstein.com
sfisher@garwingerstein.com
dlitvin@garwingerstein.com

**ODOM & DES ROCHES, LLP**
Stuart Des Roches, Esq.
Andrew Kelly, Esq.
John Alden Meade, Esq.
Suite 2020, Poydras Center
650 Poydras Street
New Orleans, LA  70130
Tel:  (504) 522-0077
Fax: (504) 522-0077
stuart@odrlaw.com

**THE SMITH FOOTE LAW FIRM LLP**
David P. Smith
W. Ross Foote
720 Murray Street
P.O. Box 1632
Alexandria, LA 71309
Tel:  (318) 445-4480
Fax: (318) 487-1741
dpsmith@smithfoote.com

*Attorneys for Plaintiff LJG Asset Management, Inc.*

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**CV 10    5205**

## I. (a) PLAINTIFFS

LJG Asset Management, Inc.

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y
NOV 10 2010
BROOKLYN OFFICE

### DEFENDANTS

JPMorgan Chase & Co., J.P. Morgan Clearing Corp., JP Morgan Securities Inc., J.P. Morgan Futures Inc., HSBC Holdings PLC, HSBC Securities (USA) Inc., and HSBC Bank USA, National Association

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **New York**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.   **MATSUMOTO, J.**

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Garwin Gerstein & Fisher LLP, 1501 Broadway, Suite 1416, New York, NY 10036, (212) 398-0055; Odom & Des Roches, LLP, 650 Poydras Center, 650 Poydras Street, New Orleans, LA 70130, (504) 522-0077; The Smith Foote Law Firm, 720 Murray Street, PO Box 1631, Alexandria, LA 71309, (318) 445-4480

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 USC 1, 7 USC 25
Brief description of cause:
Violation of the Sherman Act and Commodities Exchange Act by manipulating prices of silver futures and options contracts.

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):  JUDGE Korman   DOCKET NUMBER 1:10-cv-05054-ERK-ALC

DATE  11/10/2010   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE KAM  MAG. JUDGE ALC
10 CV 5205

## ARBITRATION CERTIFICATION

I, Dan Litvin_____, counsel for LJG Asset Management, Inc._____ do hereby certify pursuant to the Local Arbitration Rule 83.10 that to the best of my knowledge and belief the damages recoverable in the above captioned civil action exceed the sum of $150,000 exclusive of interest and costs. _____x_____Relief other than monetary damages is sought.

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:   None.

## RELATED CASE STATEMENT (SECTION VIII)

**All cases that are arguably related pursuant to Division of Business Rule 50.3.1 should be listed in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge."**

### NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County:  No._____

2.) If you answered "no" above:

a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County?  No._____

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District?    Yes._____

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County?_____

(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

Yes____x_____                              No_____

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

Yes_____(If yes, please explain)         No____x_____

_____

_____

Please provide your E-MAIL address and bar code below.  Your bar code consists of the initials of your first and last name and the last four digits of your social security number or any other four digit number registered by the attorney with the Clerk of Court. (This information must be provided pursuant to local rule 11.1(b) of the civil rules).

**Attorney Bar Code:** DL-6312_____

**E-MAIL Address:**   dlitvin@garwingerstein.com_____

Electronic filing procedures were adopted by the Court in Administrative Order No. 97-12, "In re: Electronic Filing Procedures (ECF)." Electronic filing became mandatory in Administrative Order 2004-08, "In re: Electronic Case Filing." Electronic service of all papers is now routine.

I certify the accuracy of all information provided above.

**Signature:** _____